OPINION OF THE COURT
Martin Schoenfeld, J.
In this action for declaratory, injunctive, and monetary relief plaintiff Walter E. Kimm, Jr. seeks, essentially, to compel defendants Blue Cross and Blue Shield of Greater New York (Blue Cross) and the American Stock Exchange (AMEX) to pay for the full-time nursing care he currently requires as a result of a stroke he suffered on October 25, 1989. Plaintiff now moves preliminarily to enjoin Blue Cross from denying reimbursement to plaintiff for this care. For the reasons set forth herein, the motion is granted.
BACKGROUND
Plaintiff first subscribed to AMEX-member "group insurance benefits” provided by Blue Cross in or about 1970. Effective April 1, 1983 plaintiff was covered by a "Group Contract for Comprehensive Major Medical Benefits”, number 174585, dated May 12, 1983, issued to "American Stock Exchange Members Group” (the 1983 contract). In an undated "Rider” Blue Cross agreed to provide, inter alia, the following benefit: "(b) Services of an actively practicing licensed professional nurse (R.N.) other than in a Hospital. The services of an actively practicing licensed practical nurse (L.P.N.) may be used for this purpose only when a licensed professional nurse is not available.” The 1983 contract also set forth, in "Article III — Benefits Provided”, the following:
"If a Covered Member shall incur Covered Medical Expenses, commencing while covered hereunder, in excess of the Deductible Amount, he shall be reimbursed by the Plan for 80% of the excess allowable charges (up to $2,000.00 per Benefit Period after which the balance of allowable charges *99 incurred during that Benefit Period will be reimbursed 100%) * * * The maximum aggregate payment for all Benefit Periods shall be $ * per covered Member.
"*No Lifetime Maximum”.
In her affidavit in support of the instant motion, dated October 30, 1993, plaintiffs wife, Joan Kimm, states that sometime prior to plaintiffs stroke plaintiff received a booklet entitled "American Stock Exchange member benefits manual” (the Benefits Booklet). Furthermore, Ms. Kimm states that "I am aware that plaintiff relied upon blue cross’ representations that they would provide long term care and lifetime benefits as set forth in the group policy and Benefits Booklet.”
The second page of the Benefits Booklet (this page is not numbered and should not be confused with a later "page 2”) states as follows: "We suggest you read this manual which summarizes the principal features of the various insurance coverages. The contracts and policies currently in effect will govern the operation of the plans and the payment of all benefits. In the case of any conflict between this manual and the contracts and policies, the contracts or policies shall govern.” At pages 6 to 7 the Benefits Booklet states as follows:
"Comprehensive Major Medical Benefits
"Comprehensive coverage is supplemental to basic hospital coverage and offers members * * * the broadest possible protection against medical expenses which result from an illness * * * It provides benefits * * * whether or not hospitalization is required.
"Maximum Benefits
"The maximum Major Medical Expense benefit provided during your lifetime is unlimited.
"Covered Charges * * *
"Services of an actively practicing nurse: * * *
"(b) outside a hospital, a registered professional nurse (RN) or a licensed practical nurse (LPN) when an RN is not available”.
In her reply affidavit, dated December 3, 1993, Ms. Kimm states as follows: "At no time prior to the termination of plaintiffs benefits were we provided with a copy of any group contract between blue cross and amex or any amended Benefits Booklet. Nor were we informed at any time that we were not entitled to rely upon the representations and benefits set forth in the Benefits Booklet provided to us.”
*100 According to Blue Cross, the insurance contract operative on the date plaintiffs disability commenced (the 1989 contract) was issued on April 1, 1989 and "contained a 'no lifetime maximum’ provision with respect to the amount of benefits to be paid by [Blue Cross] for private duty nursing.” According to Blue Cross, there was an "important difference” between the 1983 contract and the 1989 contract. Under the latter contract, "the coverage of a covered member automatically ends whenever * * * the entire contract is ended”. Furthermore,
"L. EFFECT OF TERMINATION
"In the event of termination of this contract * * * we will not provide any benefits for the covered services provided after the date of termination with one exception. If the covered member is totally disabled at the time of termination, we will provide the benefits of this contract * * * as long as he remains totally disabled up to but not beyond December 31 of the calendar year following the year in which the coverage terminated. These benefits will end before that date if the maximum allowable benefits under this contract * * * become available under another contract * * *
"[T]here is no right to coverage of any expense until the date that service has been received and the expense incurred. The fact that an expense had been covered before either the end * * * of this contract or coverage does not give a subscriber a right to coverage of the same * * * expense after the date of such end”.
As previously noted, plaintiff’s stroke occurred on October 25, 1989. Plaintiff’s medical condition since then need not be described in detail; suffice it to say that according to his physician, and not controverted by Blue Cross, plaintiff is "completely paralyzed”; is on a "life support system”; and "requires 24 hour care for his many medical problems.” Blue Cross initially provided plaintiff with home nursing care benefits without monetary limitation, paying some $287,000 between October of 1989 and March of 1992.
Since that time, much has occurred. Briefly to summarize, in April of 1990 Blue Cross instituted a $50,000 annual benefit limit (but continued to provide unlimited coverage to plaintiff until March of 1992); in April of 1992 State Mutual of America replaced Blue Cross as AMEX’s group health insurer; that same month Blue Cross disclaimed any further obligation towards plaintiff; shortly thereafter plaintiff filed a complaint *101 with the New York State Department of Insurance; in November of 1992 the Insurance Department found a "question of fact” that would have to be "decided by a court of competent jurisdiction” in order to resolve plaintiffs claim against Blue Cross; in April of 1993 State Mutual terminated its AMEX policy; and, recently, Blue Cross has come under highly publicized scrutiny and criticism for some of its accounting and other practices.
DISCUSSION
The New York standard for granting a preliminary injunction is well established: a movant must show (1) the likelihood of success on the merits; (2) irreparable injury absent the granting of a preliminary injunction; and (3) a balancing of the equities that favors the movant’s position. (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; Grant Co. v Srogi, 52 NY2d 496, 517 [1981].) Blue Cross argues that none of these elements are present here.

Irreparable Injury

Quite obviously, if plaintiff is denied a preliminary injunction, and if he dies because of a medical condition that could have been prevented by round-the-clock nursing care which he could no longer afford, he will have suffered the most irreparable of injuries imaginable. Plaintiffs physician, his accountant, and his wife (who states that she has "fully depleted my and my husband’s personal resources and savings”) have clearly demonstrated that not granting a preliminary injunction here would likely, perhaps inexorably, lead to disastrous (i.e., fatal) consequences. We have considered Blue Cross’ arguments that plaintiff has not demonstrated irreparable injury because (1) he has not shown financial need, (2) he waited several months after his unavailing administrative application to commence suit, and (3) he is only seeking monetary damages, and we find them factually and/or legally unavailing.

Balancing of the Equities

A balancing of the equities favors the movant where " 'the irreparable injury to be sustained by the plaintiff is more burdensome to it than the harm caused to defendants] through imposition of the injunction.’ ” (Burmax Co. v B & S Indus., 135 AD2d 599, 601 [2d Dept 1987]; accord, Kurtz v *102 Zion, 61 AD2d 778, 779 [1st Dept 1978].) This court will not trivialize the burden, even to a large health insurer, of making rather considerable payments for an indefinite period of time. On the other hand, making such payments is the "cost of doing business” for Blue Cross, whereas plaintiff, who had a right to consider himself financially insured against medical catastrophe (see, infra), is, quite literally, struggling for his very survival. On balance, plaintiff’s death would be more burdensome than Blue Cross’ payments.
Blue Cross’ argument that if it prevails "it [will have] no way of getting back any money it pays out as a result of [a] preliminary injunction from * * * plaintiff, who has insufficient assets” shall be addressed in the context of settling an order containing an appropriate undertaking, pursuant to CPLR 6312 (b).

Likelihood of Success

Blue Cross takes the position that pursuant to the 1989 contract language quoted above Blue Cross’ obligations to plaintiff ended in March of 1992 since (1) generally, benefits were not available after the termination date; and (2) the disability exception did not apply since the AMEX Blue Cross coverage was immediately replaced with State Mutual coverage. "The language in [the 1989 contract] is absolutely explicit and unambiguous that rights do not vest, and that no benefits are available after the termination of the contract, except as provided in the event of total disability, and then only if there is no available replacement coverage, as there was in plaintiff’s case.”
Plaintiff argues (1) that Blue Cross is estopped from arguing that the 1989 contract superseded the 1983 contract because a new Benefits Booklet was never issued, and (2) that, in any event, the 1989 contract simply creates an ambiguity vis-á-vis the Benefits Booklet, an ambiguity that must be construed against Blue Cross.

Ambiguity

Plaintiff’s second argument is both interesting and problematical. It is well settled that insurance contracts "must, of course, be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured’s favor and against the insurer.” (United States Fid. & Guar. Co. v Annunziata, 67 NY2d 229, 232 [1986]; accord, Danzig v Dikman, 53 NY2d 926, *103 927 [1981] [disability benefits vested at "the time of the occurrence of the event insured against” rather than at "the time of the incurring of the expenses occasioned thereby”], affg 78 AD2d 303 [1st Dept 1980].) However, the Benefits Booklet itself set forth that any "conflict” between the booklet and the "contracts and policies” would be resolved according to the latter. Still, at least one reported case, Lewis v Continental Life & Acc. Co. (93 Idaho 348, 355, 461 P2d 243, 250 [1969]), has held such a disclaimer to be ineffectual since "the equitable device of estoppel may not be thwarted by a provision in a policy drafted by the party to be estopped.”

Estoppel

However, we need not and do not reach this second argument. Preliminarily, we note that in the instant case there was no conflict or ambiguity between the Benefits Booklet, when it was issued to plaintiff, and the underlying contract. Had plaintiff read the booklet when issued, and then decided to check the contract, he would have found that the same "lifetime” coverage was promised in each. Thus we are not presented with a case where constructive knowledge of an inconsistent and overriding provision should be ascribed to an insured.
In any event, we find that, for purposes of the instant motion, Blue Cross is equitably estopped from claiming that by October of 1989 the 1983 contract had been superseded by the 1989 contract. "The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are other than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) and, in some situations, knowledge, actual or constructive, of the real facts.” (57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 17, at 25 [1986].) Furthermore,
"It is not necessary * * * to constitute an equitable estoppel that there should be a false representation or concealment of material facts. Nor is it essential that the party sought to be estopped should design to mislead. If his act was voluntary and calculated to mislead and actually has misled an other acting in good faith that is enough. * * *
*104 "When a party, either by his declarations or conduct, has induced a third person to act in a particular manner, he will not afterwards be permitted to deny the truth of the admission if the consequence would be to work an injury to such third person or to some one claiming under him.” (Trustees of Freeholders & Commonalty v Smith, 118 NY 634, 640-641 [1890].)
As succinctly summarized at 57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 15 (at 21 [1986]), the general rule is that "[p]arties are estopped to deny the reality of the state of things which they have made appear to exist, and upon which others have been made to rely.” The instant case appears to fit squarely within the ambit of this rule, since Blue Cross made it appear that the 1983 contract, and the Benefits Booklet consistent therewith, were still in effect in October of 1989, and since plaintiff’s wife has sworn, without being controverted, that plaintiff relied thereon.
While there appear to be no reported New York cases directly on point "Some [sister State] cases * * * have considered the effect of statements in * * * explanatory literature which has been issued either by the insurer to the insured, or by the employer to his insured employees * * *. In all of these cases, the courts have recognized the applicability of the doctrine of estoppel or waiver to group insurance contracts, on the basis of such statements, although varying results have been reached, depending upon the particular circumstances involved.” (Annotation, Group Insurance: Waiver or Estoppel on Basis of Statements in Promotional or Explanatory Literature Issued to Insureds, 36 ALR3d 541, 543 [1971].) As the court stated in Van Vactor v Blue Cross Assn. (50 Ill App 3d 709, 714, 365 NE2d 638, 643 [1977]): "The brochure is the main source of information for policyholders. The 65-page master contract is seldom, if ever, seen by the insured. The master contract can be amended continually, so long as a new brochure is issued advising policyholders of material changes ” (emphasis added, matter emphasized dicta).
In the instant case, the "amendment” to the policy created, in Blue Cross’ own words, an "important difference”: under the 1983 contract lifetime benefits vested upon the onset of a covered disability; under the 1989 contract disability benefits ended within a year or two of termination of the contract. However, it appears that, at least as of October of 1989, the covered employees were not advised that this "important *105 difference” ostensibly had been instituted. Moreover, despite the fact that plaintiffs moving papers expressly state that plaintiff relied upon the terms of the Benefits Booklet, Blue Cross’ 23-page affirmation in opposition to the instant motion is devoid of any mention of the booklet: there is no contention (1) that plaintiff was not supplied a copy of the Benefits Booklet; (2) that the Benefits Booklet was not meant to explain the actual policy; or (3) that plaintiff was not meant to rely on the Benefits Booklet. Thus, as it appears that plaintiff was not sent a copy of the 1989 contract, or a Benefits Booklet conforming thereto, we find that, for purposes of the instant motion, Blue Cross is estopped from claiming that the 1983 contract, and the corresponding Benefits Booklet, were superseded by the 1989 contract. (In light of this finding, we need not and do not reach plaintiffs argument, premised in part on Goll v New York State Bar Assn. [193 AD2d 126 (1st Dept)], that Blue Cross’ termination of its coverage of AMEX employees was "wrongful.”)

Other Contentions

Citing Bisca v Bisca (108 Misc 2d 227, 232 [Sup Ct, Nassau County 1981]), Blue Cross argues that preliminary injunctive relief should be denied because "[i]f [a] preliminary injunction results in giving the plaintiff all the relief which he or she could obtain after trial, the remedy should not be granted unless irreparable injury and a clear right to the ultimate relief is [sic] shown.” (See, generally, Yome v Gorman, 242 NY 395, 401-402 [1926, Cardozo, J.] [removal of bodies from cemetery]; Byrne Compressed Air Equip. Co. v Sperdini, 123 AD2d 368, 369 [2d Dept 1986] [return of automobile].) However, we need not determine whether plaintiff has shown "a clear right to the ultimate relief” (as opposed to "a likelihood of success on the merits”) since what plaintiff seeks by way of preliminary relief is simply insurance coverage pending a determination of the action, whereas what he seeks by way of a permanent injunction is insurance coverage for the rest of his life.

The Status Quo

We also find Blue Cross’ contention that a preliminary injunction will "alter the status quo” to be without merit. Blue Cross originally paid full benefits and, as is clear from the parties’ submissions, plaintiff has been diligently seeking *106 to require Blue Cross to maintain those same payments. A party may not unilaterally transform a situation, and then be heard to argue that a preliminary injunction cannot be issued because it would change the status quo (as plaintiff aptly argues, change cannot be both a sword and a shield). We also note that a central aspect of "the status quo” here is that plaintiff is still alive.
CONCLUSION
Blue Cross states that "[pjlaintiff erroneously construes the fact that because there was a 'no lifetime maximum’ provision with respect to private duty nursing benefits in his policy to mean that [Blue Cross] had an obligation to cover such expenses for the rest of his life.” Whether or not a reasonable person would assume that a "no lifetime maximum” clause means that an insurance policy, or at least benefits thereunder, could not be terminated, we find today, in essence, that a person who is insured against catastrophic illness cannot have the rug pulled out from under him or her without appropriate and timely notice — and a corresponding opportunity to make other arrangements.
Thus for the reasons set forth herein, plaintiff’s motion for a preliminary injunction is granted.